MATTHEW R, JORDAN
2366 HIDALGO AVE
LOS ANGELES, CA, 90039
424-373-0061
Fax Number (If applicable) N/A
jordan_mateo@proton.me
Plaintiff Pro Se

FILED

CLERK, U.S. DISTRICT COURT

7/29/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____ang_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Western Division                    FEE DUE

MATTHEW RICHARD JORDAN

    Plaintiff, Pro Se

    vs.

LOS ANGELES UNIFIED SCHOOL

DISTRICT,

PowerSchool Group, LLC., Bain Capital L.P. ,

PowerSchool Holdings Inc., and Does 1-10

    Defendant(s)

Case No.: _____2:26-cv-08413- SRM-BFMx_____

COMPLAINT FOR

1. VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT (47 U.S.C. § 227), WITH RECKLESS DISREGARD
2. WILLFUL AND KNOWING VIOLATION OF THE TELEPHONE CONSUMER PROTECTION ACT (47 U.S.C. § 227)
3. Declaratory Judgment – Eleventh Amendment / Arm of the State (28 U.S.C. §2201)
4. Declaratory Judgment – Judicial Estoppel(28 U.S.C. §2201)
5. Declaratory Judgment – Powerschool Joint and Vicarious Liability(28 U.S.C. §2201)
6. Declaratory Judgment – TCPA Consent Specificity (28 U.S.C. §2201)
JURY WAIVED

Plaintiff MATTHEW RICHARD JORDAN, by and through the undersigned, alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute.

2. The United States Supreme Court has held that federal courts have federal question jurisdiction over private TCPA claims. See *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 378-79 (2012). The TCPA creates a private right of action in federal court, satisfying the well-pleaded complaint rule.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

4. Plaintiff resides in this district and received all thirty-seven (37) automated, non-consensual telephone calls while physically located within this district.

5. Defendant Los Angeles Unified School District ("LAUSD") is a "body corporate and politic" headquartered and operating within this district, and is subject to personal jurisdiction and suit here. The TCPA includes "corporations" as "persons," and a "body corporate" is a corporation, which is subject to the TCPA. In other federal actions, LAUSD has affirmatively pleaded that it is a "citizen of California", including In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig., MDL No. 3047, No. 4:22-md-03047-YGR (N.D. Cal.).

6. Defendant PowerSchool Group LLC conducts continuous, systematic, and substantial business in California, and is subject to personal jurisdiction in this district under 28 U.S.C. § 1391(c)(2).

7. The claims against PowerSchool Group LLC arise directly from its purposeful availment of this forum through the provision of the Finalsite Connect platform to LAUSD for deployment and use within this district.

8. Venue is further proper because TCPA claims arise where the target receives the offending communications. See *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1260 (S.D. Cal. 2012) (holding that venue is proper where the plaintiff received the unauthorized text messages).

## II. PARTIES

9. This Court has personal jurisdiction over both Defendants.

10. Defendant LAUSD is a "body corporate and politic" operating within the Central District of California. It is headquartered at 333 South Beaudry Avenue, Los Angeles, California 90017, within this district. LAUSD transacts business, contracts, and operates its schools in this district. LAUSD's contacts with this forum are continuous and systematic, and the claims arise directly from LAUSD's conduct in this district—namely, its transmission of automated calls and texts to Plaintiff's wireless number in this district. LAUSD has purposefully availed itself of the privileges of conducting activities in California, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. See *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

11. Under the three-factor test adopted by the Ninth Circuit en banc in *Kohn v. State Bar of California*, 87 F.4th 1021, 1026 (9th Cir. 2023)—which itself follows the streamlined approach of *Puerto Rico Ports Authority v. Federal Maritime Commission*, 531 F.3d 868, 873 (D.C. Cir. 2008)—the "most important factor" in determining whether a public entity is immune from suit is whether a judgment would be paid from the State treasury. LAUSD would pay a judgment for TCPA violations from Fund 672, the Liability Self-Insurance Fund, a self-insurance pool that is wholly separate from the State treasury. Because no State funds would satisfy a judgment against LAUSD, LAUSD is not an "arm of the state" for purposes of the *Kohn* test. Further, under the plain text of the TCPA, as incorporated through 47 U.S.C. § 153(39), a "person" includes a "corporation." Under California law, LAUSD is a "body corporate and politic" (Cal. Educ. Code § 35160) and therefore constitutes a "corporation" for purposes of the TCPA.

12. Defendant PowerSchool Group LLC, per the California Secretary of State website, is headquartered at 150 Parkshore Drive, Folsom, California 95630, within the Eastern District of California, but it conducts continuous and systematic business throughout California, including in the Central District. PowerSchool contracts with LAUSD and provides the Finalsite Connect platform used to transmit the offending calls to Plaintiff. PowerSchool has purposefully directed its activities at California residents, and the

claims arise from PowerSchool's provision of services to LAUSD—a California public entity—for use in California. Additionally, PowerSchool is subject to general jurisdiction in California because its principal place of business is in this state. See *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (corporation is at home in its state of incorporation and principal place of business). The exercise of jurisdiction over PowerSchool comports with due process.

12a. Defendant PowerSchool Holdings, Inc. is the parent corporation of PowerSchool Group LLC. Defendant Bain Capital, L.P. is the private equity firm that acquired PowerSchool in October 2024 for $5.6 billion. In related multidistrict litigation arising from a data breach at PowerSchool, school districts have named both PowerSchool Holdings, Inc. and Bain Capital, L.P. as defendants. On March 18, 2026, Judge Roger T. Benitez of the Southern District of California denied Bain Capital's motion to dismiss claims brought by school districts in that litigation, finding that the school districts had "plausibly alleged Bain purposefully directed its conduct at California". Judge Benitez ruled that the allegations went "beyond describing a simple investment relationship" and that the plaintiffs had sufficiently alleged Bain began "exercising direct control over PowerSchool's decision-making" before the merger closed. The judge specifically referenced a premerger "layoff order" that "basically gutted" PowerSchool's California-based departments. See In re PowerSchool Holdings, Inc., and PowerSchool Group, LLC Customer Data Security Breach Litigation, MDL No. 3149 (S.D. Cal. 2026). Plaintiff will seek discovery to determine whether Bain Capital, L.P. and PowerSchool Holdings, Inc. exercised similar operational control over the Finalsite Connect TCPA compliance architecture at issue in this action.

13. Plaintiff is a natural person residing in Los Angeles, California, in the County of Los Angeles, particularly zip code 90039, which falls under CDCA jurisdiction.

### III. STATEMENT OF FACTS

14. Plaintiff is, and at all times relevant to this action was, the sole subscriber and registered user of the cellular telephone number (424) 373-0061 (the "Cellular Number"). The Cellular Number is assigned to a cellular telephone service (Metro by T-Mobile), subjecting it to the strict protections of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

15. In November 2025, and in February 2026, Plaintiff submitted multiple employment applications to LAUSD through the SAP SuccessFactors platform, which he later withdrew for private reasons. No portion of the application process, privacy policy, or

website contained any language requesting or obtaining Plaintiff's consent for artificial or prerecorded voice calls, automated calls, or robocalls.

16. In December 2025, Plaintiff submitted an interest form for adult education classes at Abram Friedman Occupational Center (AFOC) via a Google Form. This form likewise contained zero consent language regarding artificial or prerecorded voice calls, robocalls, or text messages unrelated to the specific inquiry.

17. Upon information and belief, any email verification or intake communications associated with the AFOC inquiry also lacked any TCPA-compliant consent for artificial or prerecorded voice calls or unrelated automated/text communications. No such consent was ever provided by Plaintiff.

18. At no point did Plaintiff provide "clearly and unmistakably" stated consent to Defendant LAUSD, Defendant PowerSchool, or any third-party vendor, contractor, or agent acting on their behalf, for the initiation of any artificial or prerecorded voice calls or automated text messages to Plaintiff's Cellular Number (424) 373-0061, as required under controlling Ninth Circuit precedent. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009)

a. Plaintiff never signed, clicked, or electronically acknowledged any document, checkbox, terms of service, privacy policy, or end-user license agreement that contained any language authorizing Defendants to place artificial or prerecorded voice calls or automated text messages to Plaintiff's Cellular Number.

b. Plaintiff never received, reviewed, or agreed to any privacy policy, terms of use, or data privacy statement—whether from LAUSD, PowerSchool, SAP SuccessFactors, Google Forms, or any other entity—that purported to obtain consent for artificial or prerecorded voice calls or automated text messages to Plaintiff's Cellular Number.

c. To the extent any such policy or statement exists, Plaintiff never saw it, never clicked "I agree," and never manifested assent to its terms. No "clickwrap," "browsewrap," or "sign-in-wrap" agreement ever obtained Plaintiff's prior express consent for the communications at issue.

d. Plaintiff never provided his Cellular Number to LAUSD, PowerSchool, or any third party for the purpose of receiving artificial or prerecorded voice calls or automated text messages. Any provision of Plaintiff's Cellular Number was for administrative purposes only—such as employment applications or class registration—and did not constitute consent to receive automated communications under the TCPA.

e. Plaintiff never received any oral or written disclosure, at the time he provided his Cellular Number, that his number would be used for artificial or prerecorded voice calls or automated text messages. No such disclosure was ever made, and no such consent was ever obtained.

f. Plaintiff never had an established business relationship with LAUSD or PowerSchool that would exempt any communication from the TCPA's consent requirements. Plaintiff has not been a student of LAUSD since July 2017, has never been an employee of LAUSD, and has never been a vendor or contractor of LAUSD.

g. Plaintiff never authorized any third party—including but not limited to SAP SuccessFactors, Google Forms, or any other platform—to share his Cellular Number with LAUSD or PowerSchool for the purpose of initiating artificial or prerecorded voice calls or automated text messages.

h. Upon information and belief, the phone intake he did with AFOC on December 3, 2025, and the email verification link sent to him also contained zero compliant TCPA "Prior Express Consent" capture mechanisms.

19. Plaintiff was a minor student in LAUSD from September 2008 to July 2017. During that nine-year period, Plaintiff's Cellular Number was never registered with LAUSD.

20. Since July 2017, Plaintiff has maintained no student, parent, employee, or vendor relationship with LAUSD.

21. Between December 5, 2025, and May 10, 2026, Defendants initiated thirty-six (36) unauthorized automated communications to Plaintiff's Cellular Number. These calls utilized an artificial or prerecorded voice, in direct violation of 47 U.S.C. § 227(b)(1)(A)(iii).

22. On May 26, 2026, Plaintiff served LAUSD and PowerSchool with a formal TCPA Demand Letter via Regular Mail and to LAUSD via Email, explicitly demanding that Defendants cease all automated calls to his Cellular Number.

23. LAUSD acknowledged receipt of this demand via email on May 28, 2026.

24. Because the initial physical mailing was misdelivered to LAUSD, Plaintiff resent the Demand Letter on June 3, 2026, via Registered Mail with Return Receipt.

25. LAUSD physically received the Demand Letter on June 5, 2026. PowerSchool received the Demand Letter, and the USPS "Green Card" return receipt is postmarked June 8, 2026.

26. As of June 8, 2026, both Defendants had undeniable, documented actual notice of Plaintiff's revocation of any alleged consent and their ongoing TCPA violations.

27. On June 11, 2026, LAUSD non-attorney risk management personnel issued a "Claim Denial Letter" (Claim No. 3126118) on official LAUSD letterhead, stating only that the claim "is rejected"—without any substantive explanation, legal justification, or factual basis for the denial—and showing no indication of compliance with litigation hold protocols or actual review by licensed attorneys. Plaintiff will seek discovery to confirm the extent of LAUSD's legal review, if any.

28. The letter includes a verification of mailing signed by a non-attorney under penalty of perjury. The body of the letter advises Plaintiff that he has six months to file a court action under California Government Code § 945.6.

29. To the extent Plaintiff's claims arise exclusively under federal law, the state-law deadline set forth in Government Code § 945.6 is inapplicable and does not govern the timeliness of Plaintiff's federal claims.

30. The inclusion of an inapplicable state-law statute of limitations warning in a formal claim denial letter has the inherent tendency to confuse and pressure an unrepresented litigant. For a pro se claimant unfamiliar with the distinction between state and federal procedural rules, such a warning could reasonably be misread as an absolute bar to any future action, thereby chilling the exercise of federal statutory rights.

31. Despite receiving actual, documented notice of their TCPA violations and Plaintiff's lack of consent, Defendants continued broadcasting robocalls to Plaintiff's Cellular Number.

32. On June 19, 2026, which is a federal holiday (Juneteenth), Defendants initiated an unauthorized, artificial/prerecorded voice robocall to Plaintiff's Cellular Number, originating from AFOC.

33. The fact that Defendants' automated system initiated a prerecorded robocall to a non-consenting number on a federal holiday, immediately following a formal cease-and-desist demand is particularly notable.

34. Each of the thirty-seven (37) unauthorized automated communications initiated by Defendants to Plaintiff's Cellular Number constitutes a concrete, particularized injury-in-fact sufficient to confer Article III standing. Under binding Ninth Circuit precedent in *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 608, 614 (9th Cir. 2017), the receipt of unsolicited automated calls to a cellular telephone is itself a legally cognizable injury.

COUNT I: THIRTY-SIX (36) VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, WITH RECKLESS DISREGARD (SAFECO WILLFULNESS) (47 U.S.C. § 227(b)(1)(A)(iii) & § 227(b)(3)(B)) – Against All Defendants

35. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

36. At all relevant times, Plaintiff's Cellular Number, (424) 373-0061, was assigned to a cellular telephone service.

37. Between December 5, 2025, and May 10, 2026, Defendants, acting individually and/or jointly, initiated thirty-six (36) non-emergency telephone calls to Plaintiff's Cellular Number using an artificial or prerecorded voice.

38. Defendants' violations of the TCPA were committed with reckless disregard for Plaintiff's statutory rights, entitling Plaintiff to enhanced statutory damages of up to $1,500 per violation under 47 U.S.C. § 227(b)(3)(B).

39. Under the standard established by the United States Supreme Court in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007), a defendant acts "willfully" or "knowingly" under the TCPA if it violates the statute with "reckless disregard" of the statutory requirements. Reckless disregard does not require proof of malicious intent; rather, it is established where a defendant's actions violate the statute or fail to comply with known legal obligations, despite having the capacity to understand and conform to the law.

40. The factual record demonstrates that LAUSD and PowerSchool possessed actual knowledge, or at minimum acted in reckless disregard, of the TCPA's strict consent requirements and the non-compliant nature of their automated dialing architecture. This knowledge was established through a series of objective events and public records:

a. As early as 2015 and 2016, LAUSD's use of centralized robocalls was widely reported in local media as a widespread public scourge, with parents describing the automated messages as "excessive", "confusing", and "frustratingly useless".

b. During the FCC 16-88 rulemaking in 2016, LAUSD formally participated as a commenter in the proceeding. (FCC-16-88A1, Appendix A at 17.) In that proceeding, the FCC issued a Declaratory Ruling explicitly holding that: (i) non-emergency robocalls to wireless numbers require "prior express consent"; (ii) the scope of consent for schools is limited to communications "closely related to the educational mission"; and (iii) schools "must be prepared to honor revocation requests." (FCC-16-88A1 at ¶¶ 23, 25.) By participating in this proceeding, LAUSD demonstrated actual knowledge of the TCPA's consent framework. LAUSD cannot now claim ignorance or mistake when it actively shaped the very rules it now violates.

c. LAUSD's formal submission to the FCC expressly represented that the District "requires message recipients to give consent to contact them". However, no form, application, or intake document with which Plaintiff interacted contained any such consent language. (FCC 16-88A1 pg. 11 footnote 86 "LAUSD Comments at 4".)

d. The FCC submission constitutes a party admission under Federal Rule of Evidence 801(d)(2). LAUSD may not now claim ignorance of the TCPA's consent requirements or argue that its failure to obtain consent was unintentional, having formally represented to a federal agency that it " requires message recipients to give consent to contact them".

e. In 2016, a TCPA class action settlement was reached regarding Blackboard Connect's systemic failures to honor opt-out requests and dial non-consenting numbers, establishing industry-wide notice of the platform's architectural deficiencies.

f. In 2023, an ABC7 investigative exposé detailed LAUSD's automated robocall practices, during which LAUSD officials publicly acknowledged and addressed the system's broadcasting architecture.

g. Defendant PowerSchool, as the provider and operator of the Finalsite Connect platform under its Master Services Agreement (MSA) with LAUSD, published a 2023 TCPA FAQ explicitly stating that "opt-in should be gathered and recorded" and that districts are "required to track and maintain documentation of permission."

h. Additionally, upon information and belief, LAUSD executed a Master Services Agreement with PowerSchool that required LAUSD to indemnify PowerSchool for "alleged or actual violations of the TCPA." By signing this agreement, LAUSD explicitly acknowledged its awareness of the TCPA's application to its automated communications and agreed to bear sole responsibility for compliance. Having contractually accepted this obligation, LAUSD cannot now claim ignorance of the TCPA's consent requirements.

41. Despite this extensive notice regarding the TCPA's requirements and the specific compliance failures inherent in the Finalsite/Blackboard architecture, Defendants recklessly disregarded their federal obligations, electing instead to continue utilizing the platform to initiate unauthorized automated and prerecorded voice calls to Plaintiff.

42. By continuing to initiate calls to Plaintiff's Cellular Number using an artificial or prerecorded voice—despite actual knowledge of the TCPA's strict consent requirements and the Finalsite/Blackboard platform's historical compliance failures—Defendants recklessly disregarded their obligations under 47 U.S.C. § 227(b)(1)(A)(iii). This conduct rises to the level of reckless disregard as defined in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). Accordingly, Plaintiff is entitled to enhanced statutory damages of $1,500 per violation on Count I.

COUNT II: ONE (1) WILLFUL AND KNOWING VIOLATION OF THE TCPA (47 U.S.C. § 227(b)(1)(A)(iii) & § 227(b)(3)(B)) – Against All Defendants

43. Plaintiff realleges and incorporates by reference all preceding paragraphs.

44. After Defendants received formal TCPA demand and litigation hold notice, confirmed by USPS Certified Mail Return Receipt on June 5, 2026 (LAUSD) and June 8, 2026 (PowerSchool), and after LAUSD issued its rejection on June 11, 2026, Defendants initiated an artificial or prerecorded voice call to Plaintiff's number. This post-notice call constitutes a willful violation of the TCPA.

45. Despite possessing actual, documented notice of Plaintiff's revocation of consent, Defendants' Finalsite Connect mass-notification platform continued to indiscriminately broadcast to Plaintiff's Cellular Number, resulting in the following specific post-notice violation:

a. June 19, 2026: Defendants initiated an unauthorized, artificial/prerecorded voice robocall to Plaintiff's Cellular Number, originating from AFOC.

46. On June 18, 2026, Plaintiff sent a second, detailed pre-litigation settlement offer in good faith, via email and UPS 2-Day delivery to PowerSchool Group LLC's Office of General Counsel at 150 Parkshore Drive, Folsom, CA 95630, and legal@powerschool.com. The letter enclosed LAUSD's rejection and a copy of both Return Receipts, and requested a substantive response by June 25, 2026. PowerSchool received the demand. (UPS tracking and delivery confirmation received June 22 at 11:16 AM).

47. Despite actual notice and a reasonable deadline, PowerSchool Group LLC provided no response whatsoever to either letter. This complete silence further evidences PowerSchool's reckless or willful disregard of its obligations as the owner and operator of the Finalsite Connect platform used to transmit the unlawful calls.

48. The June 19, 2026, robocall was initiated on a recognized federal holiday (Juneteenth). The fact that Defendants' automated system initiated a prerecorded robocall to a non-consenting number on a federal holiday, immediately following a formal demand, proves that the Finalsite Connect architecture operates as an unsegregated, indiscriminate data dump lacking basic compliance guardrails, such as permanent suppression lists or holiday execution calendars.

49. Plaintiff is entitled to statutory damages of $1,500 per willful violation on Count II.

50. Plaintiff pleads Count II in the alternative. To the extent the Court views the post-notice violation of June 19 not as a distinct statutory count, Plaintiff asserts this specific transmission as conclusive, undeniable evidence of Defendants' "reckless disregard" and "willful and knowing" state of mind, thereby mandating the $1,500 statutory multiplier for all thirty-seven (37) violations pled under *Safeco*.

COUNT III: DECLARATORY JUDGMENT — DEFENDANT LAUSD LACKS ELEVENTH AMENDMENT SOVEREIGN IMMUNITY  (28 U.S.C. § 2201)

51. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

52. An actual and justiciable controversy exists between Plaintiff and Defendant Los Angeles Unified School District (LAUSD) regarding its operational status. The Ninth Circuit Court of Appeals has, before *Kohn*, asserted LAUSD is an immune "arm of the state" entitled to Eleventh Amendment sovereign immunity. In *Brynjolfsson v. State Agency L.A. Unified Sch. Dist.*, 576 F. App'x 697 (9th Cir. 2014), Holmgeir Brynjolfsson's appeal was denied on grounds that LAUSD was an "arm of the state" entitled to Eleventh Amendment immunity. Plaintiff contends LAUSD is a body corporate subject to the strict liability provisions of the Telephone Consumer Protection Act (TCPA), and has also pled inconsistently to this status in other federal litigation.

53. The Ninth Circuit's en banc decision in Kohn v. State Bar of California, 87 F.4th 1021 (9th Cir. 2023), abrogated the Mitchell multifactor test. Any prior Ninth Circuit decision applying that defunct framework—including Belanger v. Madera Unified School District, 963 F.2d 248 (9th Cir. 1992) and Sato v. Orange County Department of Education, 861 F.3d 923 (9th Cir. 2017)—is based on dead law (Mitchell factors) and may not be cited as

binding against this Plaintiff. The Ninth Circuit, sitting en banc in Kohn v. State Bar of California, 87 F.4th 1021 (9th Cir. 2023), explicitly discarded the Mitchell framework. Under the binding en banc mandate of Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003), prior panel decisions are no longer binding when their underlying reasoning is 'clearly irreconcilable' with a subsequent en banc ruling. Because the Mitchell methodology utilized in Belanger and Sato has been expressly abrogated by the Kohn en banc court, those decisions have been stripped of their precedential weight regarding arm-of-the-state immunity. Under the arm-of-the-state analysis from Puerto Rico Ports Authority v. Federal Maritime Commission, 531 F.3d 868 (D.C. Cir. 2008), adopted by the Ninth Circuit in Kohn v. State Bar of California, 87 F.4th 1021 (9th Cir. 2023) (en banc), and considering the localized nature of liability payment, LAUSD is not an arm of the State for purposes of this federal statutory action. This conclusion is reinforced by Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 39 (1994), which holds that Eleventh Amendment immunity applies only when a judgment "must be paid out of a State's treasury."

54. The Ninth Circuit, en banc, reaffirmed that the "most important factor" is whether a judgment would be paid from the State treasury. *Kohn v. State Bar of California*, 87 F.4th 1021, 1026 (9th Cir. 2023).

55. LAUSD fails to satisfy any factor of this test. See *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873–74 (D.C. Cir. 2008) (applying the three-factor arm-of-the-state analysis).

**First Factor (State Intent):** LAUSD is a statutory local public corporation, not a constitutional instrumentality of the State. Established by statute, LAUSD operates as an "independent agency" endowed with broad corporate powers. See Cal. Educ. Code § 35160. It possesses the independent authority to sue and be sued, enter into contracts, acquire property, and exercise fiscal autonomy. Furthermore, LAUSD engages in extensive interstate and international commercial activities—such as capitalizing a captive insurance subsidiary (LAUSDIC, LLC) domiciled in Vermont with $1 billion in start-up capital, executing bond sales in Hong Kong, and retaining Royal Bank of Canada (RBC) for international bond underwriting. Critically, LAUSD assumes legal positions expressly barred to state arms, such as pleading as a citizen in federal litigation for diversity jurisdiction purposes. See *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, MDL No. 3047, No. 4:22-md-03047-YGR (N.D. Cal.) (LAUSD invoking diversity jurisdiction as a citizen of California, a jurisdictional posture unavailable to arms of the State under 28 U.S.C. § 1332 and *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973)). These attributes are fundamentally inconsistent with the status of a sovereign arm of the State.

**Second Factor (State Control):** LAUSD is governed by a local electoral mandate and is devoid of direct state operational control. The District is directed by a directly elected Board of Education that exercises plenary authority over district operations, including budget approval, superintendent selection, policy formulation, and contract execution. The State neither appoints LAUSD's governing board nor exercises direct supervisory authority over its day-to-day operations. While LAUSD must comply with general state statutes, it is not subject to the direct operational control or inherent jurisdiction of any state entity.

**Third Factor (State Treasury):** LAUSD's liability obligations are structurally insulated from, and wholly separate from the State treasury through proprietary fund classification and third-party operational architecture. LAUSD maintains a Liability Self-Insurance Fund (Fund 672) established pursuant to Education Code § 39602 to pay claims, excess insurance coverage, and administrative costs. Additionally, LAUSD formed a captive insurance company (LAUSDIC, LLC) in Vermont in June 2024, infused with $1 billion in start-up capital, to cover general liability, workers' compensation, and commercial auto risks. A judgment in this case, or any case against LAUSD would never be satisfied from the State of California's General Fund, but upon information and belief, would be executed through Fund 672 and/or LAUSDIC, LLC.

56. Under the functional approach mandated by the Supreme Court in *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994), the "impetus" and "core purpose" of the Eleventh Amendment is to protect state solvency. For immunity to attach, the State must be the direct, both legally and practically obligated payor of the judgment. Even if an entity receives state funding or performs a traditional state function, if the State is not legally required to satisfy the entity's debts, the entity is not an "arm of the state." Because the State of California is under no legal obligation to bail out LAUSD's

Fund 672 or satisfy a federal TCPA judgment against LAUSD, the functional necessity for sovereign immunity is entirely absent. The Eleventh Amendment inquiry is resolved by the plain text of the Supreme Court's sentence in *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994): "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and practically—then the Eleventh Amendment's core concern is not implicated." The Supreme Court's deliberate use of the correlative conjunction "both...and" is dispositive under elementary canons of linguistic construction. First, the Conjunctive Condition Canon dictates that "both...and" joins two separate, independently necessary elements. A "both" condition is satisfied only when both prongs are met. Because the State of California is not legally obligated to pay LAUSD's judgment debts, the legal prong fails. Where one prong of a two-pronged

"both" test fails, the entire test fails. Second, the Anti-Surplusage Canon prohibits a reading that renders the word "legally" meaningless. If "practical" obligation alone could establish immunity, the word "legally" would serve no independent function. The Supreme Court does not include surplus words; "legally" is an independent, mandatory prerequisite. Third, the Ordinary Meaning Canon requires courts to interpret "obligated" according to its plain legal definition—"bound by a legal duty." The State's discretionary ability to appropriate funds in the future is not a "legal duty" to satisfy a judgment. It is a political choice, not an obligation. Fourth, under *Expressio Unius Est Exclusio Alterius* (the expression of one thing excludes another), by specifying "legally and practically" as the exclusive measures of state exposure, the Supreme Court excluded all other considerations—such as discretionary state funding or historical appropriations patterns. Because California law imposes zero legal liability on the State Treasury for LAUSD's judgments, the *Hess* conjunctive condition cannot be satisfied. The Eleventh Amendment's "core concern" is therefore not implicated, and LAUSD is not an "arm of the state."

a. The Legal Prong Fails: California Law Explicitly Prohibits State Assumption of Local District Debt. The State of California bears no legal obligation to satisfy LAUSD's judgment debts. This is not a matter of statutory silence; it is an affirmative statutory prohibition. Under California Government Code § 53830.5(b), the State is expressly absolved of any legal liability for the debts of local school districts. Furthermore, the statutory framework for district insolvency confirms this legal firewall. California Education Code § 41320 provides that a district facing a revenue shortfall "may request an emergency apportionment through the Superintendent of Public Instruction." The use of the permissive "may request"—rather than a mandatory directive that the State "shall provide"—establishes that any state intervention takes the form of a discretionary loan, not a mandatory debt assumption. Because one legislature cannot bind a future legislature to pass an appropriation bill, and because the State is statutorily barred from assuming local liabilities, the State is under zero legal duty to satisfy a federal TCPA judgment against LAUSD. The legal prong of the *Hess* conjunctive test is therefore unmet.

b. The Practical Prong Fails: State Intervention is Discretionary, Repayable, and Ultimately Contemplates Bankruptcy. Even if the legal prong were satisfied—which it is not—the State is not practically obligated to pay LAUSD's judgments. LAUSD's reliance on the State as a "lender of last resort" conflates discretionary policy with practical legal obligation. Emergency apportionments under the California Education Code are not automatic administrative payouts drawn from an unlimited state fund; they are discretionary, repayable loans that require specific legislative appropriation. Speculation that the State might politically choose to issue a loan to maintain operations does not equate to a practical obligation to satisfy a federal judgment. More dispositive is the fact

that California's statutory scheme explicitly contemplates that a district might not be bailed out at all. Under California Education Code § 41325(a)(1), if a financially distressed district's situation cannot be salvaged through standard budget cuts, the state administrator is expressly authorized to execute a recovery plan that includes "the filing of a petition under Chapter 9 of the federal Bankruptcy Code for the adjustment of indebtedness." The State's ultimate practical mechanism for an insolvent district is not a treasury bailout, but federal bankruptcy. Because the State is neither legally nor practically obligated to bear LAUSD's indebtedness, the *Hess* "both...and" condition fails in its entirety, and the Eleventh Amendment's core concern is not implicated.

c. The State's Duty to Maintain Operations Does Not Equate to an Obligation to Satisfy Judgment Debts. The State's constitutional mandate is to keep the schools running—not to act as a deep-pocket guarantor for the district's monetary judgment debts. The practical necessity to fund basic educational operations does not translate into a practical obligation to satisfy judgments against LAUSD. Furthermore, California's statutory scheme explicitly contemplates that a district unable to meet its financial obligations will not necessarily receive a state treasury bailout, but may instead be forced into Chapter 9 bankruptcy. Under Cal. Ed. Code § 41325(a)(1), if a financially distressed district's situation cannot be salvaged through standard budget cuts, the state administrator is expressly authorized to execute a recovery plan that includes "the filing of a petition under Chapter 9 of the federal Bankruptcy Code for the adjustment of indebtedness." The State's ultimate practical mechanism for an insolvent district is federal bankruptcy, not a treasury payout. Because the State is neither legally nor practically obligated to bear LAUSD's judgment indebtedness, the *Hess* conjunctive condition fails in its entirety, and the Eleventh Amendment's core concern is not implicated.

COUNT IV: DECLARATORY JUDGMENT — JUDICIAL ESTOPPEL / INCONSISTENT LITIGATION POSITIONS  (28 U.S.C. § 2201)

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58. An actual and justiciable controversy exists regarding LAUSD's inconsistent litigation positions on its legal status, capacity, and immunity.

59. LAUSD has invoked this Court's subject-matter jurisdiction based on diversity of citizenship in a federal action, affirmatively pleading that it is a "citizen of California" —a position fundamentally incompatible with any claim of Eleventh Amendment immunity. Under *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973), a political subdivision is a citizen for diversity purposes unless it is an "arm or alter ego of the State." By invoking diversity jurisdiction as a "citizen," LAUSD necessarily took the

position that it is not an "arm of the state."

60. In the Meta MDL (*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, MDL No. 3047, No. 4:22-md-03047-YGR (N.D. Cal.)), LAUSD affirmatively pleaded that it is a "citizen of California" (LAUSD v. Meta MDL Short-Form Complaint ¶ 6 ), invoked the Federal Court's subject-matter jurisdiction under 28 U.S.C. § 1332(a) based on diversity of citizenship (Master Complaint in LAUSD v. Meta MDL ¶ 34, incorporated by reference ), and expressly stated that "LAUSD brings this action on its own behalf" (Supporting Allegations ¶ 5 ).

61. A federal court cannot exercise diversity jurisdiction over an "arm of the state," because an arm of the state is not a "citizen" for diversity purposes. See *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973). By successfully invoking diversity jurisdiction—or at minimum by affirmatively pleading its citizenship—LAUSD necessarily took the position that it is not an arm of the state.

62. LAUSD further represented in this action that it was bringing suit "on its own behalf," not on behalf of the State of California. An arm of the state would bring suit on behalf of the State, not as an independent litigant with its own proprietary injuries.

63. Upon information and belief, in the Bank Cases (*Los Angeles Unified School District v. Bank of America Corporation et al.*, Case No. 2:14-cv-07364-PA-AGRx (C.D. Cal.); *LAUSD v. Wells Fargo & Co. et al.*, Case No. 2:14-cv-07370-ODW-RZ (C.D. Cal.); and *LAUSD v. JPMorgan Chase & Co. et al.*, Case No. 2:14-cv-07371-ODW-RZ (C.D. Cal.)), LAUSD invoked this Court's jurisdiction under 28 U.S.C. § 1332(a) based on diversity of citizenship, representing itself as an independent legal entity with its own citizenship, its own financial interests, and its own legal capacity distinct from those of the State of California.

64. The Meta MDL proceedings have implicitly and conclusively established the Court's subject-matter jurisdiction over LAUSD's claims, as the case has advanced well beyond the jurisdictional pleading stage. Specifically:

a. The Judicial Panel on Multidistrict Litigation (JPML) centralizes cases in an MDL only after determining that the transferee court has jurisdiction over the transferred actions. See 28 U.S.C. § 1407 (JPML may transfer civil actions "for coordinated or consolidated pretrial proceedings"); *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, MDL No. 3047, ECF No. 150 (J.P.M.L. Feb. 1, 2023) (Transfer Order establishing the MDL). The JPML's Transfer Order constitutes an implicit finding that the consolidated cases, including LAUSD's, properly invoke federal jurisdiction.

b. On October 15, 2024, the Honorable Yvonne Gonzalez Rogers entered an Order Largely Denying in Part Meta's Motion to Dismiss the Master Complaint. That order necessarily addressed and rejected any jurisdictional challenges raised by the defendants. A court lacks authority to rule on a motion to dismiss—let alone deny one—if it lacks subject-matter jurisdiction. The denial of Meta's motion to dismiss therefore constitutes an affirmative exercise of jurisdiction over all claims in the MDL, including LAUSD's.

c. The Meta MDL has progressed to extensive merits-based discovery, including agency discovery, privilege logs, and expert disclosures. As of April 24, 2026, the Court was adjudicating Discovery Letter Briefs, and as of January 2026, Meta had produced privilege logs and the parties were litigating evidentiary disputes. Federal courts do not permit merits discovery—which is costly and burdensome—unless jurisdiction has been affirmatively established. See, e.g., *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (discovery is available only in cases over which the court has jurisdiction). The fact that the MDL Court permitted discovery to proceed—and indeed managed discovery disputes—is conclusive evidence that jurisdiction over LAUSD's claims was never in doubt.

d. LAUSD filed its Short-Form Complaint in the Meta MDL and actively participated in the litigation without ever challenging the Court's jurisdiction. By proceeding to merits-based discovery without raising a jurisdictional objection, LAUSD implicitly conceded that it is a proper party with standing to invoke federal jurisdiction—a position fundamentally at odds with its current claim of Eleventh Amendment immunity.

65. LAUSD has successfully maintained each of these positions within the meaning of *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). The Supreme Court has held that the second factor for judicial estoppel is whether the party "succeeded in persuading a court to accept [its] earlier position." The Ninth Circuit applies the same standard: the party must have "succeeded in maintaining that position," and the prior position must have been "accepted by a court." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). The purpose of this requirement is to "minimize[] the danger of a party contradicting a court's determination based on the party's prior position." Id. at 784.

66. LAUSD "succeeded" in the following prior proceedings:

a. In *Brynjolfsson v. State Agency LAUSD* (2014), LAUSD persuaded the court that it was an "arm of the state" entitled to Eleventh Amendment immunity. The court accepted that position and dismissed the case.

B. In the Meta MDL (2023-present), LAUSD persuaded the Court to accept its diversity pleadings, deny motions to dismiss, and permit merits discovery to proceed. The Court accepted LAUSD's position that it was a "citizen of California" with standing to sue.

67. LAUSD did not need to "win" the Meta MDL to satisfy the "success" prong. The standard is whether the court accepted the position—not whether the party won the case. *Hamilton*, 270 F.3d at 783. The courts accepted LAUSD's jurisdictional positions. That is sufficient.

68. These are binding judicial admissions that necessarily treat LAUSD as an independent legal entity with its own citizenship, its own financial interests, its own legal capacity, and its own injuries distinct from those of the State. An "arm of the state" cannot be a "citizen" for diversity purposes, cannot invoke § 1332(a) jurisdiction, and would bring suit on behalf of the State—not on its own behalf.

69. Having deliberately and successfully invoked this Court's diversity jurisdiction based on its status as a citizen, LAUSD cannot now take the contradictory position that it is an arm of the state immune from suit. See *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel prevents a party from gaining an advantage by taking one position, then seeking a second advantage by taking an incompatible position).

70. The doctrine of judicial estoppel applies here because:

a. LAUSD's position in the Meta MDL (that it is a citizen of California with independent legal capacity to sue and be sued in federal court) is clearly inconsistent with its position in this case (that it is an arm of the state entitled to Eleventh Amendment immunity);

b. LAUSD succeeded in maintaining its position in this case—it persuaded the courts to accept its diversity pleadings and exercise jurisdiction; and

c. LAUSD would derive an unfair advantage if permitted to assert immunity now—it would have enjoyed the benefits of federal court access as a "citizen" when it was the plaintiff, while avoiding federal court accountability as an "arm of the state" when it is the defendant.

71. This pattern of tactical manipulation is further evidenced in Los Angeles Unified School District v. JUUL Labs, Inc., et al., Case No. 2:23-cv-03730 (C.D. Cal.). In that action, after defendants removed the case to federal court, LAUSD deliberately chose not to move to remand the case to state court or assert it is an arm or alter ego of the State of California. Instead, LAUSD actively participated in federal proceedings, engaged in

merits-based discovery, and availed itself of the Multidistrict Litigation (MDL) framework to pursue its proprietary financial claims.

72. The Supreme Court has held that judicial estoppel applies to "parties who deliberately change positions according to the exigencies of the moment." New Hampshire, 532 U.S. at 749-50. But "deliberate" does not mean the party intended to create an inconsistency—it means the party intentionally took the position, not that they understood its legal consequences.

73. The Tenth Circuit has explicitly held that "the law is clear that legal advice and ignorance of the law are not defenses to judicial estoppel." Eastman v. Union Pac. R.R. Co., 493 F.3d 1151, 1159 (10th Cir. 2007). The Supreme Court in New Hampshire noted that it may be appropriate to resist application of judicial estoppel only "when a party's prior position was based on inadvertence or mistake." New Hampshire, 532 U.S. at 753. "Inadvertence" means a lack of knowledge of the facts—not a lack of knowledge of the law.

74. The "I didn't read it" defense has been rejected for over a century. The Supreme Court stated in Putnam v. Day, 89 U.S. 60, 65 (1874): "His not having sworn to his answer, or even read it, is no excuse. It was his duty to have known its contents, if not to have verified it." That principle has never been overturned. If LAUSD's lawyers filed the Meta MDL complaint invoking diversity jurisdiction, LAUSD is bound by that pleading—regardless of whether anyone at the district "read it carefully enough" or understood its legal implications.

75. LAUSD cannot claim "inadvertence" or "mistake" because the positions it took in the Meta MDL were deliberate, strategic choices made to gain access to federal court. LAUSD's General Counsel and outside counsel are sophisticated legal professionals who necessarily understood the jurisdictional implications of pleading diversity. The claim that LAUSD "didn't realize" it was taking a position inconsistent with an Eleventh Amendment immunity defense is not credible and is contradicted by the record.

76. Furthermore, LAUSD is bound by the pleadings filed on its behalf by its attorneys. The Supreme Court has consistently held that parties are responsible for their counsel's litigation decisions: "A party may be bound by the acts of his attorney in the management of a lawsuit. It is settled that the acts of counsel are attributable to the party for purposes of the doctrine of judicial estoppel." Link v. Wabash R.R. Co., 370 U.S. 626, 634 (1962) (citing Putnam v. Day).

77. LAUSD's outside counsel filed the Meta MDL Short-Form Complaint and Master Complaint. LAUSD, logically, must have reviewed and approved those filings. LAUSD cannot now disclaim knowledge of their contents or their legal effect. The district is bound by its counsel's representations—and by the jurisdictional positions those representations established.

78. If LAUSD argues that it "did not understand" the jurisdictional implications of its pleadings or pleads immunity in this case—it is an attempt to "play fast and loose with the courts" —exactly the conduct judicial estoppel was designed to prevent. New Hampshire, 532 U.S. at 749.

79. The Ninth Circuit has recognized that judicial estoppel may apply to governmental entities that take inconsistent positions in litigation. See, e.g., United States v. Ruby Co., 588 F.2d 697, 702 (9th Cir. 1978) (applying estoppel against the government where it took clearly inconsistent positions).

80. Moreover, the Ninth Circuit in a vacatur, has already determined that LAUSD is "no longer entitled to any presumption of regularity" due to its demonstrated pattern of "tactically manipulat[ing] the federal courts." Health Freedom Defense Fund, Inc. v. Carvalho, No. 22-55908, slip op. at 12 (9th Cir. June 7, 2024). This finding is directly relevant here: LAUSD's inconsistent litigation positions on its legal status—claiming to be a "citizen" in some cases and an "arm of the state" in others—are part of a broader pattern of procedural gamesmanship designed to obtain tactical advantages while avoiding accountability. The Court should decline to afford LAUSD the "benefit of the doubt" it has already forfeited.

81.This Court should therefore declare that the Eleventh Amendment is not a litigation toggle switch and LAUSD is estopped from asserting sovereign immunity and is bound by its pleadings as a citizen of California subject to the Federal Court's jurisdiction.

81(a). Jurisdictional Gamesmanship: Moreover, LAUSD's invocation of diversity jurisdiction in the Meta MDL was not merely a pleading; it was a jurisdictional prerequisite without which the MDL could not have proceeded. The JPML does not transfer cases lacking jurisdiction. See 28 U.S.C. § 1407. The MDL Court's denial of Meta's motion to dismiss, its management of discovery disputes, and its adjudication of privilege disputes all constitute affirmative exercises of jurisdiction premised on LAUSD's status as a citizen. LAUSD did not merely "plead" citizenship; it obtained six-figure discovery, substantive rulings, and procedural advantages flowing from federal jurisdiction. To permit LAUSD to recant its citizenship now would retroactively

delegitimize the MDL Court's entire exercise of jurisdiction and reward LAUSD for jurisdictional gamesmanship.

81(b). Constitutional Avoidance: Finally, construing the Eleventh Amendment to bar TCPA claims against public school districts would create an absurd result: the nation's second-largest school district could bombard millions of non-consenting cellular numbers with robocalls with complete impunity, while private schools and every other entity remain liable. Such a reading would defeat the TCPA's purpose and create a perverse incentive for public entities to outsource their communications to unregulated robocall platforms. This Court should avoid such constitutional and statutory absurdity by holding that LAUSD is not immune.

81(c). Furthermore, even if the Court were to scrutinize the doctrine of judicial estoppel, the outcome is the same under the combined mandate of Moor v. County of Alameda, 411 U.S. 693, 717 (1973), and Lapides v. Board of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 619 (2002). In Moor, the Supreme Court held that a political subdivision is a 'citizen' for diversity purposes unless it is an 'arm or alter ego of the State.' In Lapides, the Court held that it is 'anomalous or inconsistent' for a state entity to invoke federal jurisdiction and then claim Eleventh Amendment immunity. LAUSD has voluntarily and affirmatively invoked this Court's diversity jurisdiction as a 'citizen of California' in multiple high-stakes federal actions (e.g., the Meta MDL, the Bank Cases). Having voluntarily crossed the federal threshold to pursue its own proprietary financial interests, LAUSD has waived any claim to being an 'arm of the state' for the purposes of federal statutory liability. LAUSD may not selectively invoke federal jurisdiction as a sword to sue corporate defendants, and then wield the Eleventh Amendment as a shield to avoid accountability for its own federal statutory violations. By its own strategic litigation conduct, LAUSD has authored its own landmark waiver of immunity.

COUNT V: LIABILITY OF POWERSCHOOL GROUP LLC — ACTUAL KNOWLEDGE & RECKLESS DISREGARD (47 U.S.C. § 227(b)(3)(B); 28 U.S.C. § 2201)

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83. Defendant PowerSchool Group LLC is jointly and vicariously liable for the TCPA violations. PowerSchool owns, operates, and maintains the Finalsite Connect platform used by LAUSD to transmit the unlawful calls to Plaintiff's Cellular Number.

84. PowerSchool had actual knowledge of the TCPA's strict consent requirements and the

risk that its platform could be used to violate the statute. This knowledge is demonstrated by the following objective evidence:

a. PowerSchool has been named as a defendant in at least one prior TCPA lawsuit (*Keeton v. PowerSchool*, EDCA) involving its notification platforms, establishing industry-wide notice of the platform's compliance deficiencies.

b. PowerSchool published a 2023 TCPA FAQ explicitly stating that "opt-in should be gathered and recorded" and that school districts are "required to track and maintain documentation of permission."

c. Upon information and belief, the Master Services Agreement (MSA) between PowerSchool and LAUSD- and upon confirmed evidence with its other school district customers such as Cypress- Fairbanks ISD of Texas, contains an indemnification provision requiring the customer to indemnify PowerSchool for "alleged or actual violations of the TCPA in connection with Customer's use of or access to any PowerSchool Offering." Plaintiff alleges this upon information and belief because the MSA is a contract between Defendants, to which Plaintiff is not a party, and Plaintiff has not had the opportunity to review the full agreement. Plaintiff will seek discovery to confirm the existence and scope of this provision between LAUSD and Defendant PowerSchool Group.

85. This contractual provision, which exists in other publicly available Powerschool documents on the internet- if exists between LAUSD and PowerSchool as well, is a binding admission by PowerSchool of its actual knowledge of the TCPA's application to its platform. The provision is not a generic "hold harmless" clause—it specifically references "alleged or actual violations of the TCPA." PowerSchool's legal department drafted this language precisely because they knew the Finalsite Connect platform was a TCPA risk and that customers (school districts) could—and would—use it to violate the statute.

86. The legal significance of this indemnification clause is dispositive on the issue of PowerSchool's state of mind:

a. Actual Knowledge Under *Safeco*: The clause proves PowerSchool's lawyers were intimately familiar with the TCPA, its strict consent requirements, and the platform's capacity to generate liability. PowerSchool cannot now claim ignorance, mistake, or good faith. See *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (reckless disregard established where the defendant "should have known" of statutory requirements—actual knowledge is even stronger).

b. Acknowledgment of Platform Risk: By drafting a clause that shifts liability to the customer for "alleged or actual TCPA violations," PowerSchool admitted that its platform, in its default configuration, could generate TCPA liability if customers misused it. Yet PowerSchool never implemented mandatory compliance guardrails—such as permanent suppression lists, consent-capture verification, or holiday execution calendars—to prevent such misuse. It simply outsourced the legal risk to its customers.

c. Agency and Control: The provision further establishes PowerSchool's position as the sophisticated service provider in control of the technology. PowerSchool determined the system's architecture, its data integration pathways, and its compliance capabilities. LAUSD, as a customer, relied on PowerSchool's expertise. PowerSchool cannot disclaim liability by blaming LAUSD when it drafted a contract that anticipated—and sought to transfer—precisely this liability.

87. PowerSchool's awareness of the TCPA risk is further confirmed by the specific language of the provision: "alleged or actual violations" — This phrase demonstrates that PowerSchool anticipated not just lawsuits, but even the allegation of TCPA violations. They knew the platform was susceptible. They knew customers might lack proper consent. They knew the system might generate unauthorized calls. Yet they took no proactive steps to ensure the platform was TCPA-compliant by default. "in connection with Customer's use of or access to any PowerSchool Offering" — This broad causation language confirms that PowerSchool knew the liability arose directly from the use of the platform itself. PowerSchool was not a passive bystander; it was the architect of the system that transmitted the illegal calls to Plaintiff.

88. PowerSchool's actual knowledge is further compounded by its complete silence after receiving Plaintiff's detailed May 26, 2026 pre-litigation demand. Despite receiving actual notice of the violations, confirmed by USPS Return Receipt on June 8, 2026, and a second detailed settlement letter on June 18, 2026, PowerSchool provided no response whatsoever. This silence, combined with its own contractually admitted knowledge of TCPA risks, demonstrates willful and reckless disregard. A defendant cannot claim ignorance when its own contract documents identify the exact statute at issue and the exact liability scenario.

89. PowerSchool is therefore liable under the TCPA as:

a. Directly Liable: As the entity that provided, maintained, and failed to properly configure the automated notification system that initiated the illegal calls. Courts have held platform operators and service providers liable for TCPA violations when they

supply the technology that enables the calls. See *In re Joint Petition Filed by DISH Network, LLC*, 28 FCC Rcd 6574 (2013); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014) (affirming liability for entities that cause TCPA violations through third-party vendors).

b. Vicariously Liable: As LAUSD's agent for the automated notification service under the Master Services Agreement. The MSA establishes a principal-agent relationship, and PowerSchool exercised control over the platform's functionality and architecture.

c. Jointly and Severally Liable: For the thirty-seven (37) TCPA violations alleged in Counts I and II, as the joint tortfeasor whose platform enabled the unlawful communications.

90. Because PowerSchool possessed actual knowledge of the TCPA's requirements and the specific compliance failures inherent in its platform, its conduct constitutes reckless disregard as defined in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). Plaintiff is therefore entitled to enhanced statutory damages of $1,500 per violation against PowerSchool jointly and severally with LAUSD.

90(a). PowerSchool's Independent Liability: In the event LAUSD is deemed immune from suit under the Eleventh Amendment, such immunity does not extend to PowerSchool, a private corporation that is unquestionably subject to suit. In that event, PowerSchool—as the sole remaining defendant—is liable for all thirty-seven (37) violations, because it owned, operated, maintained, and failed to properly configure the Finalsite Connect platform that initiated each call to ensure TCPA compliance. Alternatively, to the extent LAUSD is not immune, PowerSchool is jointly and severally liable as the agent and joint tortfeasor whose platform enabled the unlawful communications.

### COUNT VI: DECLARATORY JUDGMENT REGARDING TCPA CONSENT SPECIFICITY (28 U.S.C. § 2201)

91. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein and seeks a declaratory judgment defining the scope of "prior express consent" under 47 U.S.C. § 227(b)(1)(A)(iii).

92. The statutory text is unambiguous. It prohibits "any call" to a wireless number "using an artificial or prerecorded voice" without "the prior express consent of the called party."

The consent required by the statute is not general; it is tethered specifically to the prohibited method of communication—calls made with an artificial or prerecorded voice.

93. The statute does not state: "without prior express consent to be contacted"; "without prior express consent for school-related non-emergency matters"; "without prior express consent unless the call is closely related to the purpose for which the number was provided"; "without prior express consent unless the plaintiff is an employee, parent, or student of the LAUSD and gave the number for enrollment or employment purposes." The statute simply mandates "prior express consent" for a call using an artificial or prerecorded voice. Any reading that dilutes this specificity—by implying consent to human calls covers robocalls, or that providing a phone number equates to consent to receive prerecorded/artificial voice messages—contravenes the plain text.

94. This textual reading is reinforced by the TCPA's legislative history. Its sponsor, Senator Fritz Hollings, described computerized and prerecorded calls as "the scourge of modern civilization" and an "invasion of our privacy." 137 Cong. Rec. 30,821–22 (1991). The statute was designed to give consumers control over automated intrusions, not to permit robocalls based on implied or general consent.

95. Controlling Ninth Circuit authority confirms that consent must be "clearly and unmistakably" stated before the robocall. *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1048 (9th Cir. 2018). Consent to be contacted generally—without specific authorization for artificial or prerecorded voice calls—does not satisfy the statute. Consequently, a defendant cannot rely on a Plaintiff's mere provision of a phone number, or a general "consent to contact," as a defense to a TCPA robocall claim.

96. A declaratory judgment is necessary and appropriate to resolve this actual controversy. Plaintiff contends that "prior express consent" under the TCPA means consent that is: (1) Prior (obtained before the call); (2) Express (affirmatively stated, not implied from circumstances); (3) Clear and Unmistakable (not general, vague, or buried in fine print); and (4) Specific to the regulated method (explicitly authorizing calls using an artificial or prerecorded voice).

97. Pursuant to 28 U.S.C. § 2201, Plaintiff requests that this Court declare: (a) that the TCPA requires clear, unequivocal, and specific prior express consent for calls made using an artificial or prerecorded voice; and (b) that general consent to be contacted, or consent implied from the provision of a telephone number, does not satisfy the statutory requirement for prerecorded calls or artificial voice calls.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a. Statutory damages of $1,500 per violation due to reckless(Safeco willful) and willful conduct (37 violations × $1,500 = $55,500);

b. Injunctive relief permanently suppressing Plaintiff's wireless number (424) 373-0061 from all LAUSD and PowerSchool systems;

c. Declaratory relief as requested in Counts III, IV, V, and VI;

d. Any applicable expense or other awards available to a pro se Plaintiff.

e. Referral of this matter to the Federal Communications Commission and/or Federal Trade Commission for investigation of regulatory violations;

f. Such other and further relief as the Court deems just and proper.

## REQUEST FOR BENCH TRIAL

Plaintiff requests a bench trial on all issues so triable in the interest of a speedy process. Plaintiff hereby waives any right to a trial by jury.

"I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." Executed on July 29, 2026

_____
MATTHEW RICHARD JORDAN
Plaintiff Pro Se

EXHIBITS- M. JORDAN 47 USC 227 (B)(1)(A)(III)

EXHIBIT A- SAP SuccessFactors screenshots; privacy policy, data privacy statement;
applications
Privacy policy-  (source)
https://career41.sapsf.com/career?company=losangel01&site=&lang=en_US&requestParams=4
T0OLrQg8lvmwV78%2fKKVyrwE20d42lvzloG1uIhBMCuxLFGvtCQzR88jsTjDN7GAlf3WwcNiC
ReZ%0aGZjcGLhy8hNT3BKTS%2fKLPBk4SzKKUosz8nNSKgrsHRhAgK2cA0iCMFsJg2BOfnp
mnItOfnlQamFp%0aZlFqSmkRg3C0D9iKnMS8dL3gkqLMvHTrtZfCnr%2bUrXZnYmCoKADqZS
xhYCkpKk0tYWBPzs8tSMyr%0aLC1kqGNghkgB3VAM1JyaY2AlVFecWZKKLMsAFAOZjSzGm
poXHxpcwsCXnFiUmloUT8hQtvhiveSi%0aJGR5nRxLfbNSd9%2fiiNTkiIhyEycff2enSs%2b8Qpf
gktzQnIAkD7dMcwsvT19LE0fbCgB4pGBF&login_ns=register&_s.crb=ir9exustd7nM0MsclI0BO
d3G9Jege8zcB5AwPcS1IIQ%3d

"LAUSD Employment Data Privacy Statement
This website allows you to apply for career opportunities at Los Angeles Unified School District.
This statement is to notify you of the practices that will govern the processing of

personal information you provide on the employment section of this website and to obtain your
consent for the use of this personal information consistent with this notice.

How do we collect personal information?

We obtain personal information about you when you provide information as part of your
candidate profile and application, through the on-line registration process. This personal
information is being collected in accordance with relevant employment laws. The purpose of this
collection is to identify, track and recruit employment candidates. You do not need to provide
any employment application information to view job openings.

What personal information do we collect?

We request your name, social security number, address, city, state, country, postal code,
telephone and email address, as well as, information regarding your job preferences, current
and prior employment history, education, language proficiencies, licenses and \
certificates, skills, and references. For employment equity purposes, self-identification of
designated group membership information may be requested. You are also given the
opportunity to provide a free-form resume and letters of reference as part of your profile.

How do we use this personal information?

The information you provide will be used to fill job openings. If you are chosen for a particular job opening for which you apply, we will retain this information and process it for personnel, administrative or other purposes related to your employment with Los Angeles Unified School District. If you are not chosen for a particular job opening for which you apply. Los Angeles Unified School District will use the contact information to reach you regarding receipt of information from you and other employment related communications. Your email address and password will be used to identify you.

How do we safeguard personal information?

We will take all reasonable measures to prevent unauthorized access or disclosure of the information that you provide.

Will we disclose the personal information that we collect?

We will share the personal information with organizations within Los Angeles Unified School District that have a business need to review your information in consideration for a position. If Los Angeles Unified School District employs you, we will share the information for processing personnel, administrative or other purposes related to your employment. As part of processing your application we will disclose your information to the Department of Justice for the purposes of fingerprinting and performing a background check. Notwithstanding the above disclosures, we will disclose personal information when required or permitted by law or for purposes relevant to Los Angeles Unified School District Personnel Policies. Other uses and disclosures may be to government entities for statistical reporting, law enforcement in response to subpoenas, other companies regarding reference checks. Your personal information is protected by the Protection of Privacy provisions of The Freedom of Information and Protection of

Privacy Act and the Privacy Rule of the Health Insurance Portability and Accountability Act (HIPAA).

How may I access my personal information?

You may visit the Los Angeles Unified School District Employment Web pages where you may update applicant, contact and password information.

What happens if this privacy statement changes?

We reserve the right to amend this privacy statement. If Los Angeles Unified School District updates or changes this privacy statement, the changes will be made on this page. Your continued use of the Los Angeles Unified School District employment website following the posting of changes to this privacy statement will mean you accept those changes and terms of this privacy statement.

Your consent:  By agreeing to these terms and conditions and providing us with your personal information, you consent to the collection and use of any information you provide in accordance with the above purposes and this privacy statement. By agreeing to these terms and conditions, you are also certifying that the information collected is correct and that you understand that misrepresentation may be cause for rejection of your application or may be cause for dismissal if employed. Agreeing to the terms and conditions authorizes Los Angeles Unified School District to conduct a personal investigation."

2. Data Privacy Statement From Applications and Screenshot-

"LAUSD Employment Data Privacy Statement
This website allows you to apply for career opportunities at Los Angeles Unified School District. This statement is to notify you of the practices that will govern the processing of personal information you provide on the employment section of this website and to obtain your consent for the use of this personal information consistent with this notice.

How do we collect personal information?

We obtain personal information about you when you provide information as part of your candidate profile and application, through the on-line registration process. This personal information is being collected in accordance with relevant employment laws. The purpose of this collection is to identify, track and recruit employment candidates. You do not need to provide any employment application information to view job openings.

What personal information do we collect?

We request your name, social security number, address, city, state, country, postal code, telephone and email address, as well as, information regarding your job preferences, current and prior employment history, education, language proficiencies, licenses and certificates, skills, and references. For employment equity purposes, self-identification of designated group membership information may be requested. You are also given the opportunity to provide a free-form resume and letters of reference as part of your profile.

How do we use this personal information?

The information you provide will be used to fill job openings. If you are chosen for a particular job opening for which you apply, we will retain this information and process it for personnel, administrative or other purposes related to your employment with Los Angeles Unified School District. If you are not chosen for a particular job opening for which you apply. Los Angeles Unified School District will use the contact information to reach you regarding receipt of information from you and other employment related communications. Your email address and password will be used to identify you.

How do we safeguard personal information?

We will take all reasonable measures to prevent unauthorized access or disclosure of the information that you provide.

Will we disclose the personal information that we collect?

We will share the personal information with organizations within Los Angeles Unified School District that have a business need to review your information in consideration for a position. If Los Angeles Unified School District employs you, we will share the information for processing personnel, administrative or other purposes related to your employment. As part of processing your application we will disclose your information to the Department of Justice for the purposes of fingerprinting and performing a background check. Notwithstanding the above disclosures, we will disclose personal information when required or permitted by law or for purposes relevant to Los Angeles Unified School District Personnel Policies. Other uses and disclosures may be to government entities for statistical reporting, law enforcement in response to subpoenas, other

companies regarding reference checks. Your personal information is protected by the Protection of Privacy provisions of The Freedom of Information and Protection of

Privacy Act and the Privacy Rule of the Health Insurance Portability and Accountability Act (HIPAA).

How may I access my personal information?

You may visit the Los Angeles Unified School District Employment Web pages where you may update applicant, contact and password information.

What happens if this privacy statement changes?

We reserve the right to amend this privacy statement. If Los Angeles Unified School District updates or changes this privacy statement, the changes will be made on this page. Your continued use of the Los Angeles Unified School District employment website following the posting of changes to this privacy statement will mean you accept those changes and terms of this privacy statement.

Your consent:  By agreeing to these terms and conditions and providing us with your personal information, you consent to the collection and use of any information you provide in accordance with the above purposes and this privacy statement. By agreeing to these terms and conditions, you are also certifying that the information collected is correct and that you understand that misrepresentation may be cause for rejection of your application or may be cause for dismissal if employed. Agreeing to the terms and conditions authorizes Los Angeles Unified School District to conduct a personal investigation.



3. Applications



EXHIBIT B- AFOC Google Form screenshots



## CTE AFOC 2025-2026 Interest Survey

Thank you for your interest in AFOC. After you have completed the form below, you will be contacted by AFOC to discuss your Career pathway. Questions? Call (213) 765-2400

Fields marked with an asterisk (*) are required.

jordan_mateo11@outlook.com Switch account
Not shared

* Indicates required question

**First Name ***
Your answer

**Middle Name**
Your answer

**Last Name ***
Your answer

**Birthdate ***
Date
mm/dd/yyyy

**E-mail ***
Your answer

**Phone Number - Best number where you can be reached (Please only enter numbers, no symbols or spaces) ***
Your answer

Are you part of any Special Program? If so, please select the program that applies.
- [ ] Work Source/ Youth Source/ One Stop Center/ AJCC
- [ ] Department of Rehabilitation
- [ ] Para Los Ninos
- [ ] Job Corps
- [ ] Disability and Support Services
- [ ] Accelerated College and Career Transition Program (AC2T)

DISABILITY SUPPORT SERVICES (DSS) — If you would like more information about accommodations and assistance provided by the DSS Office, please indicate yes below. For specific questions, please contact Kristen Robertson at k.robertson@lausd.net.
- ○ Yes
- ○ No

**Please select the class you are interested in taking. ***
- ○ A+ Certification (Computer Repair)
- ○ Computer Networking
- ○ Cybersecurity
- ○ Automobile Smog Inspector / Repair
- ○ Automobile Repair / Service Technician
- ○ Barber
- ○ Building and Grounds (Custodial) / Maintenance Supervisor
- ○ Cosmetologist
- ○ Child Development
- ○ Computer Essentials
- ○ Microcomputer Applications (formerly Computer Operations) (Monday-Friday at AFOC)
- ○ Construction / Blueprint Reading
- ○ Electrician
- ○ Heating, Ventilation, and Air Conditioning (HVAC)
- ○ Information Technology Support Technician (Saturday at Mid-City only)
- ○ Manicuring
- ○ Photovoltaic Technician (Solar Panel Installation)

**How did you hear about us? ***
- ○ Family or Friends
- ○ Bus bench advertisement
- ○ Banner
- ○ Social Media: Facebook, Instagram, Twitter, etc.
- ○ Internet Search
- ○ Student
- ○ Navigator
- ○ Department of Rehabilitation
- ○ Yelp

**Submit**    Clear form

Never submit passwords through Google Forms.

This form was created inside of LAUSD. - Contact form owner
Does this form look suspicious? Report

Google Forms

EXHIBIT C-
CALL LOGS















Exhibit D-    Demand Letter

Matthew R. Jordan K.A. Mateo Jordan, Mateo

2366 Hidalgo Ave

Los Angeles, CA, 90039

jordan_mateo@proton.me I 424-373-0061 CELL 323-664-1847 Home

DATE: May 26, 2026- Or when postmarked by USPS

Los Angeles Unified School District- 333 South Beaudry Avenue, Los
Angeles, CA 90017

COPY TO: PowerSchool Group Attn: Legal Department / Registered Agent
150 Parkshore Dr, Folsom, Ca 95630

# SUBJECT: FORMAL DEMAND FOR SETTLEMENT — 47 U.S.C. § 227 TELEPHONE CONSUMER PROTECTION ACT VIOLATIONS

CALLED PARTY: Matthew R. Jordan

WIRELESS NUMBER: (424) 373-0061

VIOLATING SOURCE: Los Angeles Unified School District "Robocall" Line
(213) 241-8100 (LAUSD/ Finalsite Connect by PowerSchool)

DOCUMENTED VIOLATIONS: 35 automated/prerecorded calls as of 5/21/26

I. STATEMENT OF FACTS

1. In November 2025, I initiated contact with Los Angeles Unified School
District ("LAUSD") to submit multiple employment applications. I also
contacted them in either November or December of 2025 to inquire about
enrollment in adult education classes. I am not, and have never been, a
parent or legal guardian of a student enrolled in LAUSD, and never
established a "student" relationship with them as an adult.

I was a LAUSD student from 2008-2017, studying at Clifford Street
Elementary School, Thomas Starr King Junior High School, John Marshall
Highly Gifted Magnet High School, and E. Manfred Evans Adult School, and

my relationship as a student ended after obtaining a high school diploma in 2017. At no point during my time as a student, did they ever have this phone number. For the entire time I was a student at LAUSD, I was also a minor.

2. Beginning December 5, 2025, and continuing through May 10, 2026, I received thirty-five (35) automated or prerecorded telephone calls from (213) 241-8100, identified as a LAUSD/Finalsite Connect "Robo-Call" automated line, to my wireless number, (424) 373-0061.

3. Twenty-five (25) of these communications resulted in voicemail messages. The preserved recordings confirm the calls were automated, pre-recorded "Robocalls". Some of them were pre-recorded human voices, and at least one was "artificial voice" , and none were employment related in nature, nor were they related to my interest in enrollment in Adult School classes. Nearly all were addressed to "LAUSD Families" or "District 2 Families." They do not constitute emergency notifications or unexcused absence alerts.

4. At no point did I provide prior express consent to LAUSD, Finalsite/PowerSchool, or any affiliated vendor to contact my wireless number via artificial/prerecorded voice "Robocalls" . I did not do so on any other LAUSD forms unrelated to my employment application as well . Under binding Ninth Circuit precedent, prior express consent must be "clearly and unmistakably" provided before automated contact is initiated. See Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1048 (9th Cir. 2018) (adopting the FCC's foundational standard that consent is valid only if "clearly and unmistakably stated," In re Implementation of the Telephone Consumer Protection Act of 1991, 7 FCC Rcd 8752, 8769 (1992)).

"Thus, our cases show that to give 'prior express consent' to receive a robocall, one need only 'clearly and unmistakably' state, before receiving the robocall, that he is willing to receive the robocall."

— Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1048 (9th Cir. 2018)

 I never "clearly and unmistakably" authorized automated or prerecorded calls to this number, nor did any application, form, or privacy notice contain TCPA-compliant consent language. I also never 'clearly and unmistakably' stated, before receiving the robocall, that I am willing to receive the robocall.

5. LAUSD's published Employment Data Privacy Statement collects telephone numbers for 'employment related communications' but contains no disclosure that providing a wireless number constitutes consent to receive automated or prerecorded calls. The policy does not reference ATDS technology, robocall protocols, or TCPA-compliant consent

mechanisms. Accordingly, no valid prior express consent exists under 47 U.S.C. § 227.

The Google Form used for interest in the AFOC adult education courses contained no consent language towards Robocalls as well, and appeared to have no privacy statement at all.

## II. LEGAL BASIS & LIABILITY FRAMEWORK

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(iii), expressly prohibits initiating any call to a wireless telephone number using an ATDS or artificial/prerecorded voice without the prior express consent of the called party.

The defendant cannot invoke a 'non-commercial purpose' defense. While 47 C.F.R. § 64.1200(a)(3)(i) exempts certain non-commercial prerecorded calls to residential landlines; no parallel exemption exists for wireless numbers under 47 U.S.C. § 227(b)(1)(B). The statutory text prohibits all artificial or prerecorded voice calls to cellular telephones absent prior express consent or emergency purpose, irrespective of commercial intent. See 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(1), (c). FCC discretionary authority under § 227(b)(2)(B) has never been exercised to exempt non-commercial wireless robocalls. Accordingly, LAUSD's status as a Unified School District and non-commercial call content are legally irrelevant to liability under the TCPA.

The FCC's 2016 TCPA Omnibus Declaratory Ruling (FCC 16-88, CG Docket No. 13-55) narrowly limits school-district robocall exemptions to emergency communications and messages closely related to the educational mission directed exclusively to parents/guardians who voluntarily provided their contact information, by the school they provided it to. Crucially, this exemption protects individual schools or educational institutions acting in a direct educational capacity. Defendant Los Angeles Unified School District ('LAUSD') is not the 'school' or 'educational institution' contemplated by FCC 16-88.

FCC 16-88 exemptions are strictly limited to 'school-related missions' conducted by individual educational institutions (ex. Locke, Lincoln, Nightingale, Allesandro, Albion, John Muir calling parents to notify them of a lockdown).

By its own name and legal structure, LAUSD is a Unified School District — a single body corporate under California Education Code § 35020 — overseeing more than 1,000 individual schools and adult education centers. All 35 violating calls originated from the centralized district robocall line (213) 241-8100 under generic district-wide branding ('LAUSD Families' and

'Board District 2 Families'), not from any specific school or from Abram Friedman Occupational Center (AFOC/DACE- (213) 765-2400), the site of Plaintiff's adult education inquiry. As a person with no parental or guardianship relationship to LAUSD, and as the calls concerned district-wide administrative outreach rather than specific school-student welfare, I fall entirely outside this exemption.

The documented pattern—35 calls across a 5-month window, 25 preserved voicemails, non-emergency content, and zero consent authorization—combined with the massive scale of the Los Angeles Unified School District—which is a "body corporate" liable for lawsuits under California state laws—supports a finding of willful or knowing disregard for TCPA compliance, triggering enhanced statutory damages under 47 U.S.C. § 227(b)(3). "The documented pattern—35 calls across a 5-month window, 25 preserved voicemails, non-emergency content, and zero consent authorization—combined with the massive scale of the Los Angeles Unified School District, supports a finding of willful or knowing disregard for TCPA compliance, triggering enhanced statutory damages under 47 U.S.C. § 227(b)(3).

The foundational standard for establishing that systemic, unknowing failure constitutes a willful violation comes from the Supreme Court decision in Safeco Insurance Co. of America v. Burr, 551 U.S. 47 (2007). The Supreme Court explicitly ruled that liability for a 'willful' violation covers both intentional acts and reckless disregard. Under the Safeco standard, an action is reckless if it entails: 'An unjustifiably high risk of harm that is either known or so obvious that it should be known.'

If a massive entity, such as the Los Angeles Unified School District, configures an automated system that blasts "Robocalls" across a centralized platform, the risk of dialing non-consenting parties is 'so obvious that it should be known.' The entity's subjective lack of knowledge regarding individual violations, if it exists (i.e. if it was actually not known to the District), is legally irrelevant because the operational design itself is objectively unreasonable. An institution does not need to know it is breaking the law—or know that it is dialing a specific non-consenting number—to be held liable for reckless and willful disregard. LAUSD's failure to segregate K-12 parent data from adult/employment contacts, and its use of centralized robocalls for non-exempt purposes, demonstrates this exact reckless disregard."

Los Angeles Unified School District is an independent special district operating as a body corporate under California Education Code § 35020, with explicit statutory authority to 'sue and be sued in any court of competent jurisdiction.' This corporate capacity distinguishes Defendant

from municipal entities in other jurisdictions that have successfully asserted 'non-person' defenses under 47 U.S.C. § 153(39).

Plaintiff further notes that California Government Code § 811.2 classifies Defendant as a 'public entity' subject to CPRA transparency mandates and independent OIG oversight. These accountability pathways operate independently of TCPA standing but compound institutional exposure when statutory violations are documented.

Los Angeles Unified School District is a unified school district operating under California Education Code Title 2, Division 3, Part 21. Under Cal. Educ. Code § 35010, every school district is governed by a board of education with authority to prescribe rules for its own government. Under Cal. Educ. Code § 35160, the governing board may initiate and carry on any program or activity not inconsistent with state law. Critically, under Cal. Educ. Code § 35162, 'In the name by which the district is designated the governing board may sue and be sued, and hold and convey property for the use and benefit of the school district.' This statutory corporate capacity establishes Defendant's liability exposure and forecloses any defense based on lack of legal personhood under 47 U.S.C. § 153(39). The defendant cannot invoke sovereign immunity.

If Defendant now claims "non-person" status to evade TCPA liability, it simultaneously concedes that its mass-notification infrastructure operates without statutory authorization, rendering the entire communications architecture ultra vires. California public agency law does not permit selective disavowal of legal capacity.

Defendant's violations are likely not isolated. LAUSD operates as a single body corporate conducting centralized district-wide robocalls under the "LAUSD Families" and "Board District 2 Families" branding from the central line (213) 241-8100 via the PowerSchool/Finalsite platform. These calls are sent at a massive scale, possibly to hundreds of thousands of wireless numbers.

The 35 calls to Plaintiff—(ex. student busing, parenting webinars, immigration clinics for families) with no relevance to his inquiry with AFOC or his employment applications—demonstrate a systemic failure to distinguish between: K-12 "student family" contacts (the narrow group potentially protected by FCC 16-88); and Adult education (DACE/AFOC), employment applicants, and other non-family contacts.

By broadcasting K-12 family content to non-parent wireless numbers obtained through unrelated channels (employment/adult ed inquiries), LAUSD demonstrates gross disregard for TCPA consent requirements. This institutional inability, disregard, or unwillingness to segregate data streams

confirms that the District prioritized mass outreach volume over statutory compliance.

Catastrophic Aggregate Exposure:

Defendant operates the second-largest school district in the United States. Its centralized robocall infrastructure broadcasts to hundreds of thousands of wireless numbers collected via mandatory enrollment forms. Each violation of 47 U.S.C. § 227(b)(1)(B) carries statutory damages of $500–$1,500. LAUSD's own enrollment data (~45,000 students annually), combined with average wireless numbers per household (1.5–2), documented call frequency (10–20 calls/year per number), and the four-year federal statute of limitations, produces aggregate exposure of $1–3 billion.

Preemptive Defense Foreclosure:

ATDS Definition Inapplicable: Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021) narrowed the ATDS definition but left intact the independent prohibition on artificial/prerecorded voice calls under 47 U.S.C. § 227(b)(1)(B). This claim rests exclusively on preserved voicemail evidence of prerecorded content.

"Knowingly Released / Invitation" Standard: (FCC 1992 Order, 7 FCC Rcd 8752 ¶ 30-31): Applies exclusively to manual, human-initiated transactional calls. Providing a telephone number during an application or enrollment creates implied consent for reasonably related, non-automated communications. This standard does not extend to ATDS or prerecorded voice systems.

LAUSD and FCC 16-88 "School/Educational Institution Status: FCC 16-88 (CG Docket No. 13-55) expressly limits the school-district robocall exemption to 'schools' 'educational institutions' transmitting emergency notifications or messages 'closely related to the educational mission' to parents/guardians who voluntarily provided contact information to that specific school. The ruling's text repeatedly references 'schools' acting in a direct instructional capacity—e.g., notifying parents of lockdowns, closures, or attendance issues. Defendant Los Angeles Unified School District, with an administrative headquarters at 333 South Beaudry Avenue is not a 'school' or 'educational institution' as contemplated by the FCC. No student receives instruction at that address; it is a centralized bureaucratic office overseeing more than 1,000 distinct schools. All 35 violating calls originated from the district-wide robocall line (213) 241-8100 under generic branding ('LAUSD Families,' 'Board District 2 Families'), not from any individual school serving Plaintiff. As Plaintiff has no parental/guardianship relationship with LAUSD and the calls concerned district-wide administrative outreach—not

student-specific welfare—he falls entirely outside the narrow exemption. See St. Clair v. CVS Pharmacy, Inc., 222 F. Supp. 3d 779, 785 (N.D. Cal. 2016) (exemptions construed narrowly; burden on defendant to prove applicability). LAUSD cannot invoke an exemption designed for school-to-parent communications to shield centralized, non-emergency broadcasts to non-parent wireless numbers obtained through unrelated employment/adult-ed channels.

FCC 16-88 Exemption Structurally Inapplicable: The school exemption applies only to individual schools transmitting emergency or attendance alerts to parents/guardians. It does not extend to centralized "body corporate" broadcasts of promotional or administrative content to non-parent constituents. See St. Clair v. CVS Pharmacy, Inc., 222 F. Supp. 3d 779, 785 (N.D. Cal. 2016).

Consent Scope Limitation: Prior express consent is strictly limited to communications "closely related" to the purpose for which the number was provided. Employment and adult education inquiries do not constitute consent for unrelated district-wide family broadcasts. See Zean v. Fairview Health Servs., 858 F.3d 520, 523 (8th Cir. 2017).

Concrete Injury Established: Unsolicited prerecorded calls to cellular telephones constitute a concrete, particularized injury-in-fact sufficient for Article III standing. Van Patten v. Vertical Fitness, LLC, 847 F.3d 1037, 1042 (9th Cir. 2017).

"Called Party" Definition: The "called party" means the subscriber or regular user of the wireless number—not the caller's subjective intended recipient. Defendant cannot evade liability by claiming misdirected intent. Lynn Breslow v. Wells Fargo Bank, N.A., 2014 WL 2488398, at *1 (11th Cir. 2014).

In summary:

Defendant should be advised that the following defenses are foreclosed by controlling authority:

ATDS Definition: Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021) narrowed the ATDS definition but did not affect the independent prohibition on prerecorded voice calls under § 227(b)(1)(B). This claim rests on preserved voicemail evidence, not ATDS allegations.

FCC 16-88 Exemption: The exemption applies to individual schools making emergency calls (weather closures, threats, health risks)—not centralized "body corporate" broadcasts of promotional content to non-parents. St. Clair v. CVS Pharmacy, Inc., 222 F. Supp. 3d 779, 785 (N.D. Cal. 2016).

Sovereign Immunity: Cal. Educ. Code § 35162 explicitly waives immunity via "sue and be sued" language.

Consent Scope: Employment and adult education inquiries do not constitute consent for unrelated district-wide "family" broadcasts under the "closely related" standard. Moskowitz v. Am. Sav. Bank, 2022 WL 2119634, at *3 (9th Cir. 2022).

Intended Recipient: "Called party" means subscriber/user—not who Defendant "meant" to call. Breslow v. Wells Fargo, 2014 WL 2488398, at *1 (11th Cir. 2014).

Standing: Prerecorded calls to cellular phones constitute concrete injury-in-fact. Van Patten v. Vertical Fitness, 847 F.3d 1037, 1042 (9th Cir. 2017).

No viable defense exists.

III. DAMAGES CALCULATION & SETTLEMENT DEMAND

Statutory Willful Exposure- 35 violations × $1,500= $52,500

Avoided Litigation & Administrative Expense, Defense counsel, discovery production, vendor coordination, compliance review- $40,000 +

TOTAL SETTLEMENT DEMAND $92,500

If the school district admits fault and publicly apologizes to Plaintiff, the constituents of the Los Angeles Unified School District, and all the taxpayers of the state of California, and sends out a mailer explaining why they did so and how they may have violated the TCPA to all LAUSD constituents, this demand drops to $ 90,500.

This amount reflects full statutory exposure if found liable for willful violations plus reasonable estimation of avoided litigation expenditure. It is offered to resolve individual claims without further resource deployment.

IV. SETTLEMENT TERMS & CONDITIONS

To resolve this matter without litigation, the following terms are mandatory:

1. PAYMENT: Remittance of $92,500 within fourteen (14) calendar days of execution of the Settlement Agreement or written acceptance of this demand, whichever occurs first.

2. NUMBER REMOVAL: Written confirmation that (424) 373-0061 has been permanently suppressed from all LAUSD, PowerSchool , and affiliated vendor calling lists, databases, and automated notification workflows.

### 3. PUBLIC RECORDS COMPLIANCE / NO NON-DISCLOSURE AGREEMENT:

Plaintiff will not execute any NDA, confidentiality provision, or non-disparagement clause. Settlement documentation shall expressly acknowledge that all terms, amounts, and factual predicates remain subject to public disclosure pursuant to pursuant to a California Public Records Act (Government Code § 6250 et seq.) request. This condition is non-negotiable.

### 4. NO CLASS OR REPRESENTATIVE WAIVER: This settlement resolves individual TCPA claims only. It expressly preserves all rights to pursue class, representative, joint, or third-party statutory claims. No waiver of collective relief is granted or implied. This is also non-negotiable.

5. The final Settlement Agreement shall contain a specific clause: "This release applies only to the individual claims of Plaintiff. Plaintiff expressly retains all rights to participate in or initiate class-action litigation regarding similar TCPA violations by Defendant." This is non-negotiable as well.

6. The district shall cease all illegal "Robocalls", to any wireless or residential line, and ensure this will not happen again.

### V. LITIGATION HOLD & PRESERVATION DIRECTIVE

Effective immediately, you are placed on notice to preserve all records, data, and communications related to automated outreach to (424) 373-0061, including but not limited to: call logs, dialer configurations, consent-capture records, Blackboard Connect/Finalsite Connect platform audit trails, vendor agreements, internal compliance memoranda, and opt-out request logs. Failure to preserve constitutes spoliation and will be addressed accordingly in subsequent proceedings.

Also, please mail copies of all of the above to 2366 Hidalgo Ave, Los Angeles, CA, 90039 via Registered First Class Mail or UPS/FedEx/DHL.

### VI. RESPONSE PROTOCOL & DEADLINE

You have thirty (30) calendar days from receipt of this letter to provide written response, settlement acceptance, or reasonable counterproposal reflecting statutory exposure and evidentiary strength. All correspondence shall be directed in writing to the undersigned. Verbal negotiation is not authorized and will not be authorized.

If no satisfactory resolution is received by the deadline, I will escalate to filing in the United States District Court for the Central District of California (or appropriate state venue) without further notice, seeking statutory

Case 2:26-cv-08413-SRM-BFM    Document 1    Filed 07/29/26    Page 51 of 64   Page ID #:51

damages, costs, injunctive relief, and all available remedies under 47 U.S.C. § 227.

All rights, claims, and remedies are expressly reserved.

Submitted,

Matthew R. Jordan K.A. "Mateo" 5/26/26



EXHIBIT E- RETURN RECIEPTS

LAUSD





POWERSCHOOL





**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

POWER SCHOOL GRP
ATTN LEGAL DEPT
150 PARKSHORE DR
FOLSOM    CA 95630

9590 9402 9834 5266 0303 10

2. Article Number (Transfer from service label)

7021 0950 0000 1924 5502

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Roland Blackmon_    ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
Roland Blackmon

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

Exhibit F LAUSD Claim Rejection Letter



Exhibit G LAUSD MDL Pleadings

"In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, Case No. 4:22-md-03047-YGR, in the U.S. District Court for the Northern District of California"

# IDENTIFICATION OF PARTIES

## A.    PLAINTIFF(S)

3. *Plaintiff(s):* Name(s) of the local government or school district alleging claims against Defendant(s):

Los Angeles Unified School District

4. Number of schools served in the Plaintiff(s)' school district or local community:

more than 1,000 schools

5. Number of minors served in the Plaintiff(s)' school district or local community:

more than 429,000 students

6. At the time of the filing of this *Short-Form Complaint*, Plaintiff(s) is/are a resident and citizen of [*Indicate State*]:

California

2

Case 4:26-cv-02463    Document 1    Filed 03/20/26    Page 3 of 96

## B.    DEFENDANT(S)

3.      LAUSD is on the front lines of addressing the damage caused to their students' mental health by defendants' intentional design choices. The District has been required to expend substantial financial resources to address and mitigate the mental health and consequent behavioral issues their students suffer as a result of social media. The scope of the problem is immense.

## II.    THE PARTIES

### A.    Plaintiff

4.      Los Angeles Unified School District is a school district organized and existing under the laws of the State of California. It is located at 333 South Beaudry Avenue, Los Angeles, California 90017. Comprised of more than 1,000 schools and 429,000 students, it is the second largest school district in the country.[4] It spans 710 square miles, including Los Angeles, as well as all or parts of 25 smaller municipalities, plus several unincorporated sections of Los Angeles County. *Id.*

5.      LAUSD brings this action on its own behalf.

### B.    Additional Defendants

6.      **Defendant Discord Inc.** ("Discord") is a Delaware corporation. Its principal place of business is 444 De Haro Street, Suite 200, San Francisco, California 94107. Its gaming and social media platform is called Discord.

7.      **Defendant Roblox Corporation** ("Roblox") is a Delaware corporation with its principal place of business at 3150 South Delaware Street, Suite 201, San Mateo, California 94403. Its gaming and social media platform is called Roblox.

---

3   *The Uncontrolled Experiment: Why Social Media Failed the Safety Test*, N. Y. Univ. Leonard N. Stern School of Business (Feb. 9, 2026), https://www.stern.nyu.edu/experience-stern/faculty-research/uncontrolled-experiment-why-social-media-failed-safety-test.

Exhibit H- LAUSD FCC Submission from FCC 16-88A1.PDF

https://docs.fcc.gov/public/attachments/FCC-16-88A1.pdf



[81] See 2015 NCLC Ex Parte Filing at 9.

[82] See also NCLC Comments at 9 ("the calls that Blackboard identifies include many types of calls that no reasonable consumer would consider to be school-related emergencies").

[83] See Blackboard Petition at 8.

[84] NCLC Comments at 9.

[85] See Blackboard Petition at 10.

[86] See Chicago Public Schools Comments at 2 (consent obtained from parents and guardians at the beginning of each school year along with request to confirm and update contact information at least twice annually); DC Public Schools Comments at 1 (message recipients give consent and designate how they prefer to be contacted); Fairfax Public Schools Comments at 5 (requires potential message recipients to provide numbers for contact purposes with ability to change this information online or by contacting the school); LAUSD Comments at 4 (requires message recipients to give consent to contact them and designate how they prefer to be contacted).

[87] The Commission has noted that "[b]y 'within the scope of consent given, and absent instructions to the contrary,' we mean that the call must be closely related to the purpose for which the telephone number was originally provided." See 2015 Omnibus TCPA Declaratory Ruling, 30 FCC Rcd at 8029, para. 141, n.474.

[88] See, e.g., GroupMe Order, 29 FCC Rcd 3442 at 3446, para. 11.

[89] See, e.g., ACA Declaratory Ruling, 23 FCC Rcd at 564, para. 9; 2015 Omnibus TCPA Declaratory Ruling, 30 FCC Rcd at 8029, para. 141, n.474.

11

**Federal Communications Commission**                    FCC 16-88

progress and that surveys can serve as a key method to improving a school's performance on important educational issues.[90] For these reasons, we clarify that such calls are closely related to the purpose for which a parent/guardian or student would provide their telephone number to an educational institution. By limiting relief to the circumstance where the call is closely related to the purpose for which the telephone number was provided to a school, we believe that we have addressed the concerns of those commenters who caution that granting Blackboard's petition would erode the TCPA's protections against unwanted calls and texts to wireless consumers.[91]

25.    One category of calls that Blackboard mentions – *non-school* events – does not

Exhibit I Powerschool TCPA FAQ and Powerschool Fairbanks MSA

https://sdpc.a4l.org/agreements/2025-02-26_3039_924_signed_agreement_file.pdf

https://resources.finalsite.net/images/v1681261822/finalsite/ff4thvun4piphilawayn/TCPA_FAQ_0.pdf

# TCPA compliance FAQ

Q: Does it apply only to automated voice messages? How about text messages?
A: TCPA applies to both telephone calls and text messages. Opt-in should be gathered and recorded for both, and updated at regular intervals.

Q: How can Blackboard assist us with TCPA compliance?
A: The Blackboard development team is nearing completion of a set of new functions and tools that will assist the district in maintaining compliance with the new regulations. We will be sharing these tools in an upcoming web event provided for our clients. This event is currently not scheduled, pending finalization of development items, but we anticipate that it will occur within the next 90 days.

Does our current notification system have a Multi-Point Strategy and tools built in to obtain compliance?
A: Connect has been designed to enable multiple touch points to parents, including phone calls, text messages, email messages, and even social media. Blackboard app users can also send messages to their mobile app users, and Web Community Manager users can send alerts as on-screen alerts to their website. You may also choose to send messages to the RSS news feed widget. No other company provides the breadth of messaging methods, and can offer this level of multi-point communication.

How can Blackboard products help us improve TCPA compliance? What kind of consent management tools do you offer?
A: We have built features into our products to help you stay compliant, and are in the final stages of further feature enhancements that will take much of the burden off the district for maintaining compliance. Some of the tools currently available include:

- Parent configurable address preferences:
  Parents can log in through the web interface (or mobile app if the district is using it) and configure their own phone numbers, email addresses, and delivery preferences. This access can be modified by the district to limit parents to view-only access, edit ability only for new addresses (but not those provided by the district), or full edit capabilities to update all addresses tied to their account
- Parent configurable delivery preferences:
  Parents can configure messages by device type, allowing them to designate an address to each type of message. For example, they can designate that miscellaneous messages only be delivered as an in-app message, while emergency messages be delivered as a text message and phone call.
- Do-not-contact list:
  By replying 'STOP' to any system text message, or by requesting a phone number be added to the do-not-contact list, a user or authorized system administrator can remove an address from our delivery service. This removal is global, and once added, a number or email address will not receive messages until removed from the list.
- Automated survey messages:
  Because of the change from opt-out messaging to opt-in messaging, districts are now required to track and maintain documentation of permission to send messages. Our recommendation is to review and renew this documentation quarterly, or at least bi-annually. One very easy way to accomplish this is through email/app surveys. While there are many survey tools available for



2. Section 3.4, Data Privacy and Security, of the Agreement is modified by deleting the first sentence and replacing it with the following:

"PowerSchool will abide by the terms of the Data Privacy Agreement ("DPA") as set forth in Exhibit C, with respect to the security of the Customer Data within the PowerSchool Offering."

3. Section 10.3, Indemnification by Customer, of the Agreement is modified by deleting "under applicable" in the first sentence and replacing it with "by".

4. Section 10.3, Indemnification by Customer, of the Agreement is modified by deleting the last sentence and replacing it with the following:

"In addition, Customer shall to the extent permitted by law indemnify and hold PowerSchool Indemnitees harmless against and from any Liability brought against a PowerSchool Indemnitee or Customer for alleged or actual violations of the TCPA in connection with Customer's use of or access to any PowerSchool Offering."

5. The following sentence is added to the end of Section 11.2, CAP ON MONETARY LIABILITY, of the Agreement:

"TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE COLLECTIVE AGGREGATE LIABILITY TO THE OTHER PARTY OR ITS AFFILIATES IN CONNECTION OR ARISING OUT OF A) ANY CLAIM BROUGHT BY A THIRD PARTY AGAINST CUSTOMER ALLEGING THE USE OF THE POWERSCHOOL OFFERING INFRINGES OR MISAPPROPRIATES THE INTELLECTUAL PROPERTY RIGHTS OF SUCH THIRD PARTY; AND B) POWERSCHOOL'S VIOLATION OF THE DPA EXECUTED BETWEEN THE PARTIES PURSUANT TO SECTION 3.2, UNDER ANY LEGAL OR EQUITABLE THEORY, SHALL NOT EXCEED THREE TIMES (3X) THE TOTAL AMOUNTS ACTUALLY PAID BY CUSTOMER TO POWERSCHOOL IN THE IMMEDIATELY PRECEDING TWELVE (12)-

1

gn Envelope ID: 27F9BCD7-D7C8-40F1-856E-788A9BC31AC4